Filed 1/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| 5TH AND LA, | B313679 |
| Plaintiff and Appellant, | Los Angeles County |
| v. | Super. Ct. No. 20STCV02781 |
| WESTERN WATERPROOFING COMPANY, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Armen Tamzarian, Judge. Affirmed.

Law Offices of Tabone and Derek L. Tabone for Plaintiff and Appellant.

Thomas | Lucas and Timothy D. Lucas for Defendant and Respondent.

_____

This is a second lawsuit about an increasingly leaky roof. After a jury found the company that coated the roof was not at fault, the building owner sued a second time when more leaks appeared. The trial court rightly found claim preclusion barred the new lawsuit and granted summary judgment for the company. The owner brought—or should have brought—all claims about the company's installation in its first suit. The owner neither alleged nor presented evidence of a new or latent way the company's work could have harmed the owner. Therefore the first judgment bars this second suit. We affirm.

I

We have two actors: a building owner and a roofing company. The building owner is 5th AND LA. The roofing company is Western Waterproofing Company, Inc. The owner operates a building in Los Angeles with retail space on the ground floor and office space, storage units, and parking on the roof. In 2012, the owner contracted with the company to remove the roof parking surface and recoat it. In their briefs, the owner calls this "roof replacement," while the company calls it a "roof coating system." We use the shorter term "coating."

The parties entered a contract detailing the coating process in about a page of text. This text includes the statement that "[t]his includes a 5 year warranty for materials and labor tha[t] can be renewed at the end of 5 years." Next is a schedule for the work and the cost: $285,000.

After that is a section called "Alternate Cost #1 - 2017." It states, in part:

"This includes a 5 and 5 warranty from the manufacturer. This project will be reviewed with the owner/Sika [the manufacturer of the coating material] and Western in 5 years. If

2

in 5 years there is a requirement to re top coat the deck from wear and tear the following would be the cost. This would be a requirement to extend the warranty another 5 years. . . . Total Cost . . . . $37,000."

We call the just-quoted paragraph the renewal paragraph. Other provisions not pertinent to this dispute follow this paragraph.

The company finished work in July 2012. Within a month, the owner saw problems and concluded the company improperly installed the coating. By July 2013, the owner believed the entire coating needed to be removed and replaced.

In October 2013, the owner filed the first suit on theories of breach of an express warranty against product failure and breaches of implied warranties. The owner alleged the entire coating was beginning to fail and demanded the company remove and replace it all rather than merely undertake a leak-by-leak repair.

The case went to trial in 2015. By then the roof had about 10 leaks. The company admitted to errors in its work, such as improper ordering and timing of material applications. The company argued, though, that the owner had not shown these errors caused the leaks.

The owner lost at trial. The jury found: (1) the company provided a warranty for its work, (2) the coating did not perform as promised within the warranty period, (3) the owner took reasonable steps to notify the company that the coating did not perform as promised, and (4) the owner was harmed, but (5) the failure of the coating to perform as promised was *not* a substantial factor in causing the owner's harm. The special

verdict form had four more questions that the jury, following the form's instructions, did not answer.

The owner appealed and argued the special verdict was inconsistent and unsupported. The Court of Appeal affirmed, finding the jury could have concluded "the incorrect installation . . . was not so faulty as to allow water to penetrate, and any leaks came from some other source." (*5th AND LA v. Western Waterproofing Company, Inc.* (Mar. 29, 2017, B266363) [nonpub. opn.] [p. 7].) The court found sufficient evidence for this result because (1) the *owner's* expert never explicitly said the issues with the coating caused the leaks, and (2) the *company's* expert identified possible sources of the leaks outside the company's work, such as "gaps in door frames and cracks in the masonry and stucco." (*Id.* [p. 9].)

After the March 2017 appellate opinion, the owner wrote to the company in May 2017 to "invok[e]" the option to renew the warranty. The company "will need to inspect the deck" and the owner would pay up to $37,000 "for any required work." The original five-year warranty expired in July 2017.

In August 2017, the company responded to the owner's letter and said claim preclusion barred the owner's claims. The company did not inspect the roof.

In January 2020, the owner filed this second suit with the following allegations. The roof now had about 50 leaks "all due to failures of labor (workmanship) by [the company]." The company "refused to inspect the roof or honor the extension of the warranty." The company breached the contract's express warranty by "refus[ing] to . . . honor its warranty and repair and/or replace the roof to stop the leaks in the subject roof, and prevent further leaks." The owner sought damages of $300,000,

4

did not separate its complaint into distinct causes of action, and did not label its claim.

The company moved for summary judgment on two grounds: (1) claim preclusion, or (2) the warranty had expired and had not been renewed. The court granted summary judgment on both grounds.

The court found claim preclusion applied because the owner was suing on the same primary right: "for [the company] to honor its warranty for the work it did in 2012."

The court interpreted the contract to extend the warranty only if the coating required no new work in 2017 or if the roof needed a new top coat due to wear and tear and the owner paid $37,000. The court found neither option applied.

The owner appealed the summary judgment ruling.

## II

The summary judgment was correct. We independently review this decision by applying the familiar standard. (See *Bacoka v. Best Buy Stores, L.P.* (2021) 71 Cal.App.5th 126, 132.) We proceed, first, by interpreting the scope of the warranty, and second, by addressing claim preclusion.

## A

The warranty covers harm from the company's materials and labor but not damage arising from other causes.

We interpret contracts to give effect to the parties' mutual intent. (Civ. Code, § 1636.) Contractual language governs so long as it is clear, explicit, and not absurd. (Civ. Code, § 1638.)

The text shows the warranty covers only the company's materials and labor and does not apply to leaks from other causes. The contract, with our emphasis, has a "5 year warranty for *materials and labor* tha[t] can be renewed at the end of 5

5

years." The warranty covers what it says it covers: materials and labor. Successful claims on this warranty must be about defects caused by the company's materials or labor.

The owner incorrectly interprets the warranty to guarantee there are no leaks from *any* cause. The owner founds its claim preclusion arguments on this misinterpretation. We describe the owner's stance and identify its error.

The owner has said the cause of leaks is immaterial to its second lawsuit. Its response to the company's separate statement repeatedly stated, with our emphasis, that the lawsuit was "focused on breach of the express 10 year warranty-that the roof is not watertight, *whatever the cause*, not that [the company] did a poor installation job." Its opening brief maintained the warranty requires the company to keep the roof "watertight" for ten years.

These interpretations are incorrect because they fail to honor the warranty's limiting words about "materials and labor." Under this wording, the company is not an insurer. It is not obligated to keep the roof watertight no matter the cause.

In its reply brief, the owner finally concedes the warranty does indeed relate to the company's work. With our emphasis, the owner's reply brief says the company "warranted *its materials and workmanship* for ten years and there would be no leaks *due to its workmanship or failure of materials*."

To prove the company breached the warranty, then, the owner must prove harm due to the company's materials or labor.

The owner cites *Dell, Inc. v. Superior Court* (2008) 159 Cal.App.4th 911, a case that does not affect the interpretation of this warranty. The owner quotes a definition from that case: "An express warranty is both a representation of fitness and an

6

agreement to repair." (*Id.* at p. 927.) That definition is not pertinent to interpreting the words "materials and labor."

The parties dispute whether the warranty was renewed, but that issue is not decisive. The company prevails on claim preclusion grounds no matter how we might decide the renewal issue, so we assume without deciding that the warranty was renewed and lasts 10 years.

The owner argues that the warranty's requirement that the company review the project after five years for wear and tear is a reason the warranty extended to 10 years. The owner does not raise this point as an independent source of relief, so we do not consider the issue. The key here is not the duration of the warranty but its content, and the relationship of the first judgment to the second suit.

The company cites testimony from the owner's manager about how the manager interpreted the renewal paragraph. The owner says this argument violates the parol evidence rule. We do not decide this issue because this testimony is not relevant to our analysis of the warranty's scope.

In sum, the warranty covered materials and labor only, which was the issue in the first suit, as the next section demonstrates.

B

Claim preclusion bars the owner's second suit.

Claim preclusion bars a new lawsuit if the first case had (1) the same cause of action; (2) between the same parties, or parties in privity; and (3) a final judgment on the merits. (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824–825 (*DKN*).) Following our Supreme Court's lead, we refer to this doctrine as "claim preclusion," not "res judicata." (*Id.* at pp. 823–824.) The

doctrine promotes judicial economy by preventing claim splitting. It requires all claims based on the same cause of action, which *were or could have been raised*, to be decided in a single suit. (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 92–93.)

The owner concedes elements two and three, so this case is about only the first element, which asks whether the second suit is about the same *cause of action*. But how does one determine this issue?

This issue can be knotty.

Reigning doctrine tells us that, in applying this first element, courts must discern whether the lawsuits involve the same "primary right"—the plaintiff's right to be free from the injury suffered—and breach of duty. We examine the claimed harm and determine whether it is the same in both actions. (See *DNK*, *supra*, 61 Cal.4th at p. 818 & fn. 1.)

The case *Thibodeau v. Crum* (1992) 4 Cal.App.4th 749 (*Thibodeau*) is instructive as it, like this case, involves a worsening condition following a new physical installation. In *Thibodeau*, homeowners arbitrated claims about construction deficiencies with a general contractor, and then filed a second action against a subcontractor who installed their driveway. (*Id.* at pp. 752–754.) Before arbitration, the driveway had radiating cracks and broken chunks. During arbitration, the homeowners presented an estimate to fix the broken chunks and the arbitrator awarded money for " 'Concrete driveway repair.' " (*Id.* at p. 753.) The radiating cracks worsened and the homeowners sued the subcontractor. (*Id.* at pp. 753–754.) The Court of Appeal concluded claim preclusion applied because the homeowners included or should have included the issue of radiating cracks in

8

the arbitration.  (*Id.* at p. 756.)  The *worsening* of the cracks did not change the analysis.  (*Id.* at p. 757.)  There were "no successive breaches."  (*Id.* at p. 758.)  The court wrote, "The Thibodeaus were aware of the cracks and complained about them long before the arbitration.  And the driveway continued to deteriorate during the pendency of the arbitration.  The driveway was, in fact, within the scope of the arbitration; it is mentioned several times in the arbitration award.  *We can conceive of no logical reason why the arbitration should encompass the chunks but not the cracks.*"  (*Id.* at p. 756, italics added.)  The first suit—the arbitration—thus barred the second.

Here, the claimed harm is the same because both lawsuits are about the same primary right:  the owner's right to be free of harm from the company's materials or labor.  The first suit found the company's installation did not harm the owner.  The company has not performed new work since that single installation.  There is no new breach.  The owner litigated problems with the company's workmanship in the first suit, which resolved the issue.

Following *Thibodeau*, changed conditions or new facts are not, by themselves, enough.  New leaks are pertinent *only if the owner asserts they are from a cause the owner did not know about and could not have known about in its first lawsuit.*  The complaint does not make this allegation.  The opposition to summary judgment does not mention some new or latent cause.

"We can conceive of no logical reason" why the first suit should encompass the first leaks but not the later ones.  (*Thibodeau, supra*, 4 Cal.App.4th at p. 756.)  That is, whatever physical cause accounted for the first leaks apparently is still at work, but the first suit settled the liability for that physical

9

cause.  The second suit simply tried to relitigate a resolution the owner disliked and would prefer to escape.  Claim preclusion bars this repetitive attack on finality.

Indeed, the owner has disclaimed the need to demonstrate a new or latent cause.  As we have recounted, the owner believed the company was responsible for leaks, "whatever the cause."  The owner asserted it could sue for each leak, "even if the cause of all of the leaks is the overall poor job done by [the company] in installation in 2012."  That is incorrect.  The second suit is barred because it is about the same allegedly poor installation the owner litigated in its first suit.

The owner cites cases about changed conditions and facts, but none involves a worsening condition of the same physical installation.

*Neil Norman, Ltd. v. William Kasper & Co.* (1983) 149 Cal.App.3d 942 (*Neil Norman*) was a case about the timing of two different shipments.  In *Neil Norman*, the subject of the first lawsuit was a manufacturer's late shipments and defects in one lot of wool sweaters.  Claim preclusion did not bar a later suit about defects in a lot of acrylic sweaters the plaintiff received only after it dismissed the first lawsuit.  (*Id.* at pp. 946–948.)  We distinguish *Neil Norman* just as the *Thibodeau* opinion did:  Neil Norman "could not have known of defects in the acrylic sweaters when he filed the first suit and . . . still did not know of such defects when he dismissed the first suit with prejudice.  This situation is quite different from the case at hand, in which the [owner] knew of the [leaks], watched them worsen, and complained about them long before the [first suit]."  (*Thibodeau, supra,* 4 Cal.App.4th at p. 757; see *Neil Norman, supra,* 149 Cal.App.3d at p. 947.)  The second and newly-arrived defective lot

in *Neil Norman* was a new cause of action and a different breach. This case, however, is about the same roof, the same job, and the same type of defect. *Neil Norman*'s logic does not apply.

The case *Allied Fire Protection v. Diede Construction, Inc.* (2005) 127 Cal.App.4th 150, 153 is distinguishable because it involved two different claims: one contractual, one for fraud. The defendant's fraud caused the plaintiff not to discover facts to support its second claim until after the plaintiff filed the first lawsuit. (*Id.* at p. 157.) There is nothing like that here.

To this point, our analysis has followed California's reigning doctrine. Our "long-standing approach to res judicata" is the "primary right" theory. (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 904, 909 & fn. 13 (*Mycogen*).)

The owner, however, asks us to reject this primary rights approach and invites us to analyze this case using the transactional approach of the Restatement Second of Judgments.

We accept the owner's invitation because California courts routinely turn to the Restatement Second of Judgments for guidance. (E.g., *DKN*, *supra*, 61 Cal.4th at pp. 822, 828–829.) The Supreme Court in *Mycogen* wrote: "Amici curiae urge this court to abandon the primary right theory and adopt the transactional approach of the Restatement Second of Judgments. As the result in this case would be the same under either theory, we decline to reconsider our long-standing approach to res judicata." (*Mycogen, supra*, 28 Cal.4th at p. 909, fn. 13.) This statement implies the Supreme Court indeed had analyzed the case under the transactional approach and had determined this second path led to the same destination. We follow this lead to see whether the transactional approach is a useful complement to the historic and governing primary rights approach.

11

What is the "the transactional approach of the Restatement Second of Judgments"? (*Mycogen, supra*, 28 Cal.4th at p. 909, fn. 13.) For a case like this one, the following Restatement Second rules apply.

"A valid and final personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same claim." (Rest.2d Judgments, § 19.)

The decisive rules here are these: "(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim . . . , the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the *transaction*, or series of connected transactions, out of which the action arose. [¶] (2) What factual grouping constitutes a '*transaction*', and what groupings constitute a 'series', are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." (Rest.2d Judgments, § 24, italics added.)

"A *mere shift in the evidence* offered to support a ground held unproved in a prior action will not suffice to make a new claim avoiding the preclusive effect of the judgment." (Rest.2d Judgments, § 25, com. b, italics added.)

Analysis under the Restatement Second of Judgments supports affirmance. The "transaction" here was the contract about the roof. The owner does not propose some alternative definition of the "transaction." The owner's argument hinges on the new leaks, which is a "mere shift in the evidence." (Rest.2d Judgments, § 25, com. b.) Alone, this shift does not save this case

12

from claim preclusion. The owner does not assert some different and previously undiscovered physical cause as the reason for the new leaks. Under the transactional approach, then, the result is the same as the primary rights approach: the owner loses.

Our Supreme Court has written "the primary right theory is notoriously uncertain in application. 'Despite the flat acceptance of the . . . theory . . . by California decisions, the meaning of 'cause of action' remains elusive and subject to frequent dispute and misconception.' " (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 395 [quoting 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 35, p. 100]; see also Axelrad, *The Primary Rights Theory of Claim Preclusion*, L.A. Daily J. (Dec. 1, 2022) p. 5 col. 4–6 [referring to the "elastic quality of the primary rights theory" and citing authorities].)

These comments echo observations in the Restatement Second of Judgments. (See Rest.2d Judgments, § 24, com. a ["There was difficulty in knowing which rights were primary and what was their extent . . . ."].)

The esteemed Judge Curtis Karnow pointedly has developed this theme. His trenchant and broad-gauged attack on the unpredictability and incoherence of the primary rights theory concludes "no one really knows what it means in practice." (Karnow, *Primary Rights* (2018) 28 S. Cal. Interdisc. L.J. 45, 46.) Karnow traces the primary rights theory to its root, identifies its central weaknesses, and catalogs its persistent and severe critics, from Holmes to contemporary scholars. (*Id.* at p. 51 & pp. 47–49.) Karnow muses the "cracks perhaps presag[e] its demise." (*Id.* at p. 46.)

Any demise of Supreme Court law may be announced, of course, only by the Supreme Court. Lower courts may simply

follow our Supreme Court's practice of using the Restatement Second's transactional method as a useful complement to check results from the reigning primary rights theory. This complementary analysis buttresses the conclusion that the first judgment bars this second suit.

Because the company wins on claim preclusion, we do not address its other arguments for affirmance.

### DISPOSITION

The judgment is affirmed. We award costs to Western Waterproofing Company, Inc.


WILEY, J.


We concur:


STRATTON, P. J.



HARUTUNIAN, J.*

---

* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14